## Case No. 15,324.

### UNITED STATES v. HASWELL.

[Whart. State Tr. 684.]

Circuit Court, D. Vermont. May 5, 1800.

SEDITIOUS LIBEL—TRUTH IN JUSTIFICATION—PROOFS.

[Where a justification is relied on, the proofs must fully sustain the charges of the publication; otherwise the defense fails. Hence an offer to prove that certain officers of the government had acknowledged the policy of occasionally appointing Tories to office is not a justification of a charge that the government was selecting Tories, "men who shared in the desolation of our homes, and the abuse of our wives and daughters."]

[This was an indictment under the act of July 14, 1798 (1 Stat. 598), against Anthony Haswell, for a seditious libel.]

The alleged libellous matter which the defendant was indicted for publishing was as follows: "To the Enemies of Political Persecution in the Western District of Vermont: Your representative (Matthew Lyon) is holden by the oppressive hand of usurped power in a loathsome prison, deprived almost of the right of reason, and suffering all the indignities which can be heaped upon him by a hard-hearted savage, who has. to the disgrace of Federalism, been elevated to a station where he can satiate his barbarity on the misery of his victims. But in spite of Fitch (the marshal) and to their sorrow, time will pass away; the month of February will arrive, and with it bring liberty to the defender of your rights? No. Without exertion it will not. Eleven hundred dollars must be paid for his ransom. This money it is impossible for Col. Lyon to raise in an ordinary way. A contribution is talked of, but this is an uncertain. humiliating. and precarious method. Col. Lyon has adopted a plan which accords with his feelings. and he hopes it may be with those of his friends. The plan is this: He has purchased a grant for a lottery. upon which he has formed a scheme whereby he designs to sell his tickets for money to the amount of his fine and consequent losses; and pay the prizes in land. houses. and such other property as he has, to

dispose of. May we not hope that this amount may answer the desired purpose, and that our representative shall not languish a day in prison for want of money after the measure of Federal injustice is filled up? At the same time the administration publicly notified that Tories, men who had fought against our independence, who had shared in the desolation of our homes, and the abuse of our wives and daughters, were men who were worthy of the confidence of the government."

April 28, 1800. The defendant appearing in court with his counsel, Mr. Israel Smith and Mr. Fay, a motion for a continuance was made by them on the ground of the absence of material witnesses. The defendant filed an affidavit to the effect that he expected to prove by General Darke, of Virginia, and Mr. McHenry, the secretary of war. that the government had on one occasion acknowledged the policy of occasionally appointing Tories to office; and that every effort had been made to obtain the attendance of these gentlemen,' but in vain. The affidavit also stated that two witnesses from the immediate neighbourhood were expected. but had not yet arrived, one being detained by accident. and the other by sickness.[1]

The continuance was resisted by the district attorney on the ground. 1st, that due diligence had not been shown in collecting the wanting testimony; 2d, that even if it could be got, it would be inadmissible.

PATERSON, Circuit Justice. with whom was HITCHCOCK, District Judge, said that the first item of evidence would not be admissible, even if present. as it would not be a flat justification; but that in order to permit the defendant to avail himself of the attendance of other witnesses whom he momentarily expected, a postponement of several days would be granted.

May 5th. The case being called. the district attorney opened the case on the part of the United States.

Evidence was produced to show that the passages in the indictment had been published in a newspaper called the Vermont Gazette. edited by the defendant; the first being part of an advertisement issued by a committee of Colonel Lyon's friends. the second being an extract from the Aurora.

In justification of the first paragraph. the defendant called witnesses to prove circumstances of peculiar hardships attending Lyon's imprisonment.

The jury were addressed by the district attorney and the defendant's counsel, and afterwards by the defendant himself.[2]

---

[1] Among the papers in my hands is a series of very curious letters from the defendant to Mr. Duane and Mr. Lyon, asking for evidence by which the charges in the indictment could be justified. This they were unable to furnish, at least in a legal shape.

[2] The following passages are extracted from a manuscript defence written by Mr. Haswell.

PATERSON, Circuit Justice, charged the jury, that, though the statute had benignly altered the common law, in so far as to permit the truth to be given in evidence, yet, unless the justification came up to the charge, it was no defence. Here it was for the jury to determine whether the violent language applied to the marshal as descriptive of his treatment of Colonel Lyon, had been sustained by the evidence. If it had not, no defence had been made out. As to the charge against the administration of selecting Tories "who shared in the desolation of our homes," &c., no attempt at justification has been made. If the jury, therefore, believe, beyond reasonable doubt, that the intent was defamatory, and the publication was made, they must convict. Nor was it necessary that the defendant should have written the defamatory matter. If it was issued in his paper, it is enough.

The jury, after a short deliberation, returned a verdict of guilty, and the court sentenced the defendant to a fine of two hundred dollars, and an imprisonment of two months.

In 1844 an act passed congress refunding this fine to the representatives of the defendant, with over forty years' interest.

Of Mr. Haswell himself, who for some time was an active and useful citizen of Vermont, I have gathered the following particulars: He was born at Portsmouth, England, in the year 1756. His family were attached to the navy of Great Britain, and he had several brothers who became officers in that service. Taking a dislike to a seafaring life, he found his way to the New World, under the protection of some friends, and landed at Philadelphia, where he met his cousin, Susannah Haswell, who had married a gentleman by the name of Rawson. Mrs. Rawson was distinguished for her literary acquirements, and was the author of one of the first of American novels, entitled "Trials of the Human Heart." Soon after the arrival of Mr. Haswell in this country, the war of the Revolution broke out, and, as he had determined to make America his home, he engaged in the Continental service, in defense of her liberties, and periled his life at the battle of Monmouth. After leaving the army, he went to Boston, and thence to Worcester, where he became acquainted with Isaiah Thomas, the celebrated veteran of the press, who was then extensively engaged in the business of printing, and, under the patronage of Mr. Thomas, acquired a thorough knowledge of the printer's art. Shortly after this, on Mr. Thomas' relinquishing his business, his office passed into the hands of Mr. Haswell, who did not long retain it, but went to Hartford, Connecticut, and thence to Springfield, Massachusetts, in the prosecution of his affairs. Not meeting in either place with the success he desired, he was induced by earnest solicitation, and offers of pecuniary advantage, to turn his attention to the state of Vermont, then called the "New Hampshire Grants." He accordingly removed to Bennington, and, in the month of June, 1783, in connection with Mr. David Russell, he established the Vermont Gazette, which, from that time to the present, has been published by Mr. Haswell and his descendants, and is probably one of the oldest newspaper establishments in the United States. After the adoption of the constitution, and the admission of Vermont to the Union, Mr. Russell was appointed by General Washington collector of the revenue for the district of Vermont, and disposed of his interest in the Gazette to Mr. Haswell, who thus became sole proprietor. At the period of the commencement of the Gazette, in 1783, the Revolutionary War had indeed been brought to a close, but there remained for the "New Hampshire Grants" a controversy with New York and New Hampshire, respecting the rightful jurisdiction over the territory, which was scarcely less embittered than the national struggle, in securing the glorious issue of which Vermont had borne so conspicuous a part. This contest, surviving the Revolution, had been

---

and read to the jury, which is now in my hands: "With respect to the first count, gentlemen, I believe you will entertain a doubt at least whether I am, in fact, the publisher of it, in the common acceptation and real meaning of the term. It is true, gentlemen, that it was published in my paper, that I am sole editor and printer, and that I was at home at the time; but it is equally true that the publication was made by Elias Buel, as manager, and James Lyon, as clerk, of Col. Lyon's lottery, and that, if any consequences flowed from it, both they and I rationally expected they must bear them. If either of you, gentlemen, should publish in a newspaper that you would reward in a pecuniary manner any person who should perform a certain business, could a person performing claim his reward of the printer? If either of you, being sufficiently responsible, should publish, with your name, anything that operated to your neighbor's injury, could an action lie against a printer? If he could not, gentlemen, in the case stated, call on the printer for his reward, due in consequence of another person's publication, on what grounds of reason can a printer be called on in a case affecting not merely interest, but personal liberty, the dearest privilege of life, for a publication avowed by responsible men, and accompanied with their names. But even allowing that I was the publisher of the advertisement on which I stand indicted, I believe it will be admitted by you all, gentlemen, as a principle founded on the reason and fitness of things, that no inference ought to be drawn from a passage on which a citizen is indicted that does not clearly flow from the premises; that the plain and obvious meaning of the written or printed words ought not in any wise to be evaded, nor any construction to be put upon it, in order to criminate the citizen, but what it will clearly and unequivocally bear; much less should any innuendo or exemplification be admitted that does not spring spontaneously from the writing itself. With this impression, gentlemen, I must beg you to read with attention the first section of the advertisement published by Major Buel and James Lyon as aforesaid, on which I stand indicted; I mean from the beginning to the first close, or partial close, of a sentence; that is, to the first semicolon. If you can do this, and on your oaths declare that Major Buel and Mr. Lyon as publishers, or myself as their humble agent, meant to call in question the authority of the United States, and did not mean to refer to an assumption of power, and undue vigour, in the marshal and his agents, solely and exclusively, I shall acknowledge myself more deceived with respect to the general application of meaning to printed and written language than I ever remember to have been at any former period of my life. I am persuaded, gentlemen, that whatever may have been your judgment with respect to the meaning of the clause in question, and the intention of its authors, when you attend to the evidence of Mr. Hicks, of Mr. Fitch himself, that you will be sensible that I had conceived the idea that a federal officer had usurped a power of adding to the vigour of the law by unnecessary severity, a total failure of politeness, and ungentleman-like behaviour, and in this idea, whether true or false, I was fully confirmed by his conduct subsequent to the letter I wrote to him, relative to the sentiment of a judge of this honorable court."

marked by measures on the part of the enemies of the "grants," which were calculated to subject to severe tests the firmness and patriotism of the people. Yet they had rejected with scorn the offers of annexation to the neighboring province of Canada, which were made to them by the emissaries of Britain. Under the guidance of their statesmen, the Allens, Chittendens, and others, they had found time and inclination, in the midst of a strife for existence itself, to contribute largely to the success of our national arms. By the time the constitution was adopted, however, this controversy with New York and New Hampshire had been closed, and the state of Vermont was admitted into the Union on the 4th of March, 1791. In bringing about this result, the public press contributed largely, and Mr. Haswell was conspicuous among those who conducted it, both for his devotion to the cause of independence, and his ability in maintaining it. He possessed the unlimited confidence of the leading men of the state, and rewarded it by a faithful support of the public interests. Previous to the admission of the state, post-offices were established at various places in it, and Mr. Haswell was appointed postmaster-general for the "grants." Bennington was at this time the focus of the state. Here the committee of safety held their most important sessions. Governor Chittenden resided in the neighbouring town of Arlington, and Col. Ethan Allen was for some time an inmate in the family of Mr. Haswell. After the admission of Vermont into the Union, and until near the close of Washington's administration in 1797, there existed comparatively little diversity of political opinion; but, when the next presidential election approached, the people were soon marshalled in the two great parties, into which the country began to be divided. Mr. Haswell attached himself with great earnestness to the Democratic ranks, and the publication of the alleged libellous passages, given in the text, was not an unnatural consequence. The indignities with which he was treated were for a long time the subject of bitter party agitation. "He was arrested," it was said, "at night, and notified to prepare for a journey to Rutland early in the morning. Accordingly, at a very early hour, Mr. Haswell, although in very poor health, and totally unaccustomed to riding, was compelled to mount a horse, and ride sixty miles through the rain on a cold day in October, to the jail at Rutland. Here he was thrown into a filthy prison at midnight, notwithstanding his entreaties to be permitted to dry his clothes, which were saturated with the rain, and to repose himself in decent quarters, after the fatigue of his journey. Several of the most responsible men in Rutland offered any security the marshal might demand, to induce him to grant these requests, but in vain. The prisoner was thrown into the prison, and never afterwards recovered entirely from the shock thus given to his health. From Rutland he was taken the next morning to Windsor, where he was to be tried. His sentence was rigidly carried out, and he was remanded to the jail at Bennington to fulfil his imprisonment. At the expiration of his sentence, an immense concourse of people from the neighbouring county assembled to welcome him back to liberty, and to signalize their disapprobation of his imprisonment. He marched forth from his quarters at the jail to the tune of Yankee Doodle, played by a band, while the discharge of cannon signified the general satisfaction at his release." Mr. Haswell immediately resumed the publication of the Gazette, which he continued nearly down to the time of his death, which occurred on the 22d of May, 1816, in his 60th year. Mr. Haswell was highly respected, not only by his friends, but by his political opponents. He was distinguished in private life by exemplary conduct in the discharge of his duties, and by his devotion to the moral and religious improvement of society.